1164

CITY OF BEDFORD, City of Blackstone, Town of Culpeper, City of Danville, Town of Elkton, City of Franklin, Town of Front Royal, City of Harrisonburg, City of Manassas, City of Martinsville, City of Radford, Town of Richlands, City of Salem and Town of Wakefield, Virginia, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

Town of Clintwood, Virginia, Intervenor.

CITY OF BEDFORD, City of Blackstone, Town of Culpeper, City of Danville, Town of Elkton, City of Franklin, Town of Front Royal, City of Harrisonburg, City of Manassas, City of Martinsville, City of Radford, Town of Richlands, City of Salem and Town of Wakefield, Virginia, Petitioners,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent,

City of Summersville, West Virginia, Intervenor.

Nos. 82–1655, 82–1656.

United States Court of Appeals, District of Columbia Circuit.

Argued March 21, 1983.

Decided Oct. 7, 1983.

Matt, Washington, D.C., was on brief, for petitioners.

A. Karen Hill, Atty. F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Deputy Sol., Washington, D.C., was on brief, for respondent.

George F. Bruder, Washington, D.C., for intervenors. James E. Hickey, Jr., Washington, D.C. entered an appearance for intervenors.

Before WALD, SCALIA and FRIEDMAN,* Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

In this petition, the City of Bedford and thirteen other Virginia municipalities contend that the Federal Energy Regulatory Commission violated the Federal Power Act in issuing preliminary permits under § 797(f) of the Act to the municipalities of Clintwood and Summersville, without investigating whether those municipalities had ceded control of the relevant hydroelectric projects to private developers. Petitioners further contend that the Commission's action was arbitrary and capricious because it deviated from Commission precedent, was unsupported by a reasoned explanation, produced arbitrary and irrational results, and failed to take account of the applicants' lack of candor and good faith. For the reasons described below, we affirm the Commission.

I

The Federal Power Act, ch. 285, 41 Stat. 1063 (1920) (codified as amended at 16 U.S.C. §§ 791a–828c (1982)), empowers the Commission to issue licenses for the construction, operation and maintenance of hydroelectric facilities. 16 U.S.C. § 797(e) (1982). License applications must include detailed maps, specifications, and cost esti-

Marc R. Poirier, Washington, D.C., with whom Cynthia S. Bogorad and Peter K.

* The Hon. Daniel M. Friedman, Circuit Judge of the United States Court of Appeals for the Federal Circuit, Washington, D.C., sitting by designation pursuant to 28 U.S.C. § 291(a) (1976).

mates for proposed projects. *Id.* at § 802; *see* 18 C.F.R. §§ 4.1–.113 (1983).

In order to encourage applicants to expend the resources necessary to prepare license applications, Congress authorized the Commission to issue preliminary permits, 16 U.S.C. § 797(f) (1982), the purpose of which is to "maintain[ ] priority of application for a license" during a period, not to exceed three years, in which the applicant may prepare a detailed license application. *Id.* at § 798. Should competing license applications be filed despite the granting of a preliminary permit, the Commission's rules require that the license be granted to the permit holder if his proposal is at least as well adapted to the public interest as those of the other applicants; and further require that he be given an opportunity to amend his application, if necessary, to meet that test. 18 C.F.R. § 4.33(h) (1983).

The statute gives a priority to permit applications and to license applications filed by states and municipalities.[1] The Commission has held that "hybrid applications" for permits, *i.e.,* those filed jointly in the name of a governmental unit and a private developer, do not qualify for this priority. *City of Fayetteville Public Works Commission,* 16 FERC (CCH) ¶ 61,209, at p. 61,456 (1981).

In September 1980, the Town of Clintwood, Virginia, and the City of Summersville, West Virginia, filed applications, each jointly with Noah Corporation, a private developer, for preliminary permits to study the feasibility of developing hydroelectric projects at the John Flannagan and Summersville dams in their respective states. In December of that year those applications were amended to delete Noah and leave the municipalities as the sole applicants.

The Municipal Electric Power Association of Virginia and its members filed competing permit applications for projects at the John Flannagan and Summersville dams on February 9, 1981, and on March 18, 1981, respectively. Each application was subsequently amended to delete the Association, leaving the petitioners as the named applicants. On May 20 and 22, the Commission's Office of Electric Power Regulation issued preliminary permits to Clintwood and Summersville, respectively, on the basis of the municipal preference contained in the Act and the Commission's own first-in-time rule.[2] *Pennsylvania Renewable Resources, Inc.,* 15 FERC (CCH) ¶ 62,209 (1981); *City of Summersville,* 15 FERC (CCH) ¶ 62,218 (1981). The petitioners and other competing applicants appealed, claiming that although Clintwood and Summersville were listed as the sole applicants on their respective permit applications, the projects were in fact joint ventures between the named municipalities and Noah Corporation and were therefore not entitled to the municipal preference. They urged the Commission to investigate the relationship of the municipalities with the Noah Corporation and requested leave to initiate discovery in each case.

The Commission denied the appeals, saying in part:

> In light of recently articulated Commission policy denying the municipal preference to hybrid applications, hybrid joint ventures may attempt to circumvent the policy by concealing the existence of the nonmunicipal partners and filing or amending applications to achieve municipal status .... [T]his maneuver would be self-defeating, in light of existing and fundamental licensing requirements.

1. Section 7(a) of the Federal Power Act provides:

> In issuing preliminary permits hereunder or licenses where no preliminary permit has been issued ... the Commission shall give preference to applications therefor by States and municipalities.....

16 U.S.C. § 800(a) (1982). The statute defines municipality:

> "municipality" means a city, county, irrigation district, drainage district, or other political subdivision or agency of a State competent under the laws thereof to carry on the business of developing, transmitting, utilizing, or distributing power....

16 U.S.C. § 796(7) (1982).

2. This court has previously upheld the Commission's first-in-time rule. *See City of Dothan v. FERC,* 684 F.2d 159 (D.C.Cir.1982).

The preliminary permit issued to the Town of Clintwood is not transferable. The eventual licensee of a project must hold all property and other rights necessary for the construction, maintenance, and operation of the project. To the extent that any party other than the named permittee holds requisite rights, either the named permittee must acquire those rights or the other party holding those rights must be made a joint applicant for license. In the latter event, the permittee will lose its priority of application for license.

[T]he Commission has concluded that the preferable policy is not to investigate contractual arrangements underlying permit applications, but rather to put the full burden on applicants to see to it that they acquire the requisite rights. Lack of candor or inability to acquire the requisite rights will mean forfeiting of permittee priority.

*Pennsylvania Renewable Resources, Inc.,* 17 FERC (CCH) ¶ 61,031, at p. 61,066 (1981) (footnotes omitted); *City of Summersville,* 17 FERC (CCH) ¶ 61,030, at pp. 61,064–65 (1981) (footnotes omitted).

On rehearing the Commission once again rejected the petitioners' claims, saying in part:

Existing licensing requirements, by themselves, have the effect of defeating any attempt to circumvent the Commission's policy announced in *Fayetteville.* In the *Fayetteville* decision, we discussed the substantial reasons that preclude, at the preliminary permit stage, an investigation of the relationship between municipal and private entities (so-called "hybrids") who are joint applicants. The reasons include the drain on limited staff resources and the administrative delay such investigations would entail. These same considerations militate against investigating, at the preliminary permit stage, allegations pertaining to "hidden hybrids".

In this regard we note that a preliminary permit is not transferable, and that the eventual project licensee must hold

all property and other rights necessary for construction, maintenance, and operation of the project. As indicated in the *Fayetteville* decision, the Commission has ample authority and opportunity in the licensing proceeding to fashion an effective remedy for any abuse of the municipal preference provision. Failure to reveal in a license application that someone other than the permittee will hold requisite project interests may violate not only the Commission's regulations, but federal statutory law as well. We therefore prefer, for the reasons discussed above, to confine policing of the municipal preference provision to the licensing proceeding, which is the more appropriate forum for evaluating factual, legal, and policy issues pertaining to development of hydropower resources.

*Pennsylvania Renewable Resources, Inc.,* 19 FERC (CCH) ¶ 61,033, at pp. 61,050–51 (1982) (footnotes omitted); *City of Summersville,* 19 FERC (CCH) ¶ 61,032, at p. 61,049 (1982) (footnotes omitted).

II

■ As an initial matter, we are met with a challenge to our authority to hear this case. Intervenors, the Town of Clintwood and the City of Summersville, contend that the granting of their preliminary permits and the denial of the petitioners' competing permit applications are not appropriate for our consideration since the Commission's action will not be final, and hence reviewable, until a license for the hydroelectric project is ultimately granted or denied.

The Federal Power Act provides court of appeals review to "[a]ny party to a proceeding ... aggrieved by an order issued by the Commission in such proceeding." 16 U.S.C. § 825*l*(b) (1982). While the provision is on its face unqualified, it has long been interpreted as limited to final orders—that is, "orders of definitive impact, where judicial abstention would result in irreparable injury to a party." *Papago Tribal Utility Authority v. FERC,* 628 F.2d 235, 238 (D.C.Cir. 1980). Federal courts of appeals have previously reviewed Commission grants of pre-

liminary permits, but without explicitly addressing the question of finality. *See City of Dothan v. FERC,* 684 F.2d 159 (D.C.Cir. 1982); *Delaware River Basin Commission v. FERC,* 680 F.2d 16 (3d Cir.1982). In our view, the test of definitive impact and irreparable injury is properly met.

Although the preliminary permit looks toward and may lead to a license, it is a grant separate and apart from the license itself, and—like a stock warrant—has a certain independent value of its own. Its whole purpose, as described above, is to induce applicants to expend resources in preparation of a license application who might otherwise be unwilling to do so. This hypothesis of unwillingness precludes the assumption that any harm done by wrongful denial of the permit will be remedied when the partly wrongfully denied files a license application competing with that of the wrongful permittee, at which point it can be given the priority it should have been promised from the outset. The very assumption of the statute is that such license application may not be forthcoming. Nor can it be asserted with any degree of confidence that the situation can be set right at the licensing stage *without* a subsequent license application by the wronged party—for example, by a court degree requiring deferral or even rejection of the wrongful permittee's license application and according the wrongfully rejected permit applicant the requested permit at that later date, for the development of an application within the next three years. Apart from the fact that this would delay a process that Congress is intent on expediting, particularly with respect to small hydroelectric projects such as those in the present case, *see* Public Utility Regulatory Policies Act of 1978, § 405, 16 U.S.C. § 2705 (1982), it would not give the permittee precisely what had been wrongfully withheld. The permit, after all, is an assurance of priority during a specified period of time. A promise of priority issued at a later date, when the demand for hydroelectric power and the financial market may have altered, and other circumstances may have developed that increase the likelihood of a superior compet-

ing license application, is not the same. We therefore think it realistic to regard the injury arising from wrongful denial of the permit as a separate injury whose extent is imponderable and therefore irreparable—which means that immediate review can be obtained. *See Papago Tribal Utility Authority v. FERC, supra; Niagara Mohawk Power Corp. v. FPC,* 538 F.2d 966 (2d Cir. 1976).

### III

Petitioners contend that the Commission violated the Federal Power Act by granting preliminary permits without investigating whether the successful applicants acted in secret agreement with private developers to share control of the licensed projects. They note that the language of the municipal preference provision, *see* note 1, *supra,* does not differentiate between the license and permit stages. They argue that the Commission's willingness to investigate a municipality's control over a project before granting a license, but refusal to do so before granting a permit, constitutes an abdication of the Commission's statutory responsibility.

■■■ It should be clarified, at the outset, that the necessity for municipal control of the project has nothing to do with the municipal preference as such, but rather derives from the generally applicable requirement of the Federal Power Act that the operator (whether or not a municipality) be a licensee. 16 U.S.C. § 817 (1982). An obviously implied corollary is that the licensee be the operator, wherefore the Commission's rules require that all persons who will have proprietary rights necessary for operating the project appear as applicants on the permit and license applications. 18 C.F.R. § 4.30(d) (1983). Thus, *any* applicant for a license or permit who intends to cede operating control of the project to a nonapplicant files an invalid and perhaps unlawful application. *See* 18 U.S.C. § 1001 (1976). In other words, *Fayetteville*'s requirement that the permit application be filed exclusively in the name of a competent

municipality sets forth all that is necessary to comply with the municipal preference provisions of the Act. Incompatible control commitments to a private developer may render a permit application by a municipality *invalid,* but they do not transform it into an application by a *non*-municipality. And if the requirement to investigate such commitments were absolute and unqualified, it would extend not merely to municipalities but across the board to all permit applicants. Of course because of the municipal preference the incentive for abuse of municipal applications is undoubtedly greater—but limiting the investigation to that class would already concede the existence of some investigative discretion.

■ It is also necessary to appreciate that the nature of the investigation at issue here is not as simple as petitioners suggest. The Commission's policy cannot be read, as petitioners would desire, to invalidate all municipal permit applications where the municipality has outstanding commitments to private developers incompatible with a licensee's control obligations. Indeed, even such commitments at the *license* application stage are not categorically invalidating. As the Commission stated in *Fayetteville,* the license applicant is merely required to "hold *or intend to acquire*" the necessary rights. *Fayetteville, supra,* at p. 61,457 (emphasis added). Similarly, the Commission's regulations require, as noted above, that applications identify as applicants only those persons who "ha[ve] *or intend*[ ] *to obtain,* and will maintain," proprietary rights necessary to operation. 18 C.F.R. § 4.30(d) (1983) (emphasis added). What is at issue, therefore, is the existence of incompatible commitments *which the applicant* (whether for a permit or a license) *has no intention of eliminating.* (At the license stage, of course, the *feasibility* of eliminating them is also relevant.) Thus, when the Commission speaks of "policing . . . the municipal preference," *Pennsylvania Renewable Resources, Inc., supra,* 19 FERC (CCH) ¶ 61,-033, at p. 61,051, in order to prevent "attempt[s] to circumvent the [*Fayetteville*] policy by concealing the existence of the non-municipal partners," *Pennsylvania Re-*

*newable Resources, Inc., supra,* 17 FERC (CCH) ¶ 61,031, at p. 61,066, it has in mind not merely the present existence of incompatible commitments, but an actual intention to operate the project jointly.

The Commission has not (as petitioners suggest) eliminated at the permit application stage a requirement which it imposes at the license application stage; at both points it deems the intent to share control of the completed project with a nonapplicant to be invalidating. The difference in treatment consists in the manner in which it has chosen to enforce that prohibition: At the license application stage, it has conducted actual inquiry into the existence of contractual arrangements that may establish invalidating intent; at the permit application stage, by contrast, it has relied solely upon the certification on the face of the application that the license will be sought, and hence control will be exercised, by the applicant alone. As the excerpts from its opinions quoted above show, it has chosen this divergent manner of enforcement because it has determined that intensive investigation at the later stage will have almost complete deterrent effect at the earlier stage as well—since there is nothing to be gained from a nontransferable permit which can lead, after the incurring of some expense, only to a license application that will be denied and possibly prosecuted. The Commission believes that this approach will achieve the goal of eliminating widespread abuse while at the same time conserving the agency's enforcement resources and expediting the issuance of permits.

■ It may be acknowledged that one of the exceptions to the general proposition that investigative and enforcement priorities are matters "committed to agency discretion by law," 5 U.S.C. § 701(a)(2) (1982), *see General Motors Corp. v. FERC,* 613 F.2d 939, 944 (D.C.Cir.1979); *Kixmiller v. SEC,* 492 F.2d 641, 645 (D.C.Cir.1974), is investigation or enforcement bearing upon a statutory entitlement that an agency is charged with issuing to one of a number of compet-

ing applicants. Even so, the very nature of those subjects counsels that we accord the agency's judgment great weight. In the present case, that judgment was obviously exercised with care and deliberation, and the results seem to us in accord with the obligation imposed on the agency by § 7(a). They do not, to be sure, guarantee that no municipal permit applicant violating the law through misrepresentation of its qualifications will ever displace a properly qualified applicant, but no system can insure that. The Commission's dual reliance upon the certification of the public authority that it is the sole applicant and subsequent investigation which will deprive misrepresentation of all value, is eminently reasonable. The Act requires no more.

### IV

Petitioners claim that, in addition to constituting a violation of § 7(a) of the Federal Power Act, the Commission's refusal to inquire into the allegedly hybrid character of the Clintwood and Summersville applications constituted arbitrary and capricious action for various reasons. First, they assert that it deviates from the Commission's precedent, which requires municipalities at the permit application stage to submit evidence of their qualification in another respect—namely, their competence under local law to engage in hydroelectric projects. *See, e.g., Vigilante Electric Cooperative, Inc.,* 11 FERC (CCH) ¶ 61,270, at p. 61,529 n. 3 (1980). This practice is in fact established by rule. 18 C.F.R. § 4.81(a)(4) (1983); *see* 46 Fed.Reg. 55,245, 55,246, 55,-248–49 (1981). But the divergent treatment of this particular qualification seems to us entirely reasonable. It is, to begin with, more readily verifiable: The applicant can produce an official document or opinion that will demonstrate competence, whereas the qualification at issue here—genuine intent to control the resulting project—may require cumbersome and time-consuming investigation. Moreover, legal competence is in a sense a jurisdictional issue. If a municipality's operation of a hydroelectric project is *ultra vires,* then presumably its preparation to do so is *ultra vires* as well, so

that the purported permit application is not effectively an application *by* a municipality.

 The petitioners also contend:

• That the Commission's policy lacks a reasoned explanation. This does not survive scrutiny, as shown by the above quoted excerpts from the Commission's opinions.

• That the results of the Commission's policy are irrational because they bear no relation to the actual arrangements between the applicants and others. This assumes *either* that it is the existence of arrangements incompatible with municipal control rather than intent to continue those arrangements which is the vitiating factor, *or* that the Commission's selected method of enforcement must be 100 percent effective. Neither assumption is correct.

• Finally, that the Commission failed to consider the applicants' duty of good faith and candor. That objection is governed by our earlier discussion. We decline to upset the investigation and enforcement priorities the Commission has here decided upon, whether the matter at issue be portrayed as intent to share control or bad-faith failure to disclose intent to share control.

*Petitions denied.*